**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **TERESA WILSON,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:05-CV-1210-K (BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of Title 28, United States Code, § 636(b)(1)(B), and an Order of the Court in implementation thereof, subject cause has been referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before the Court are the following:

(1) *Plaintiff's Opening Brief*, filed December 19, 2005;

(2) *Commissioner's Motion for Summary Judgment*, filed March 24, 2006;

(3) *Defendant's Memorandum in Response to Plaintiff's Opening Brief and In Support of Motion for Summary Judgment*, filed March 24, 2006; and

(4) *Plaintiff's Reply Brief*, filed April 25, 2006.[1]

Having reviewed the evidence of the parties in connection with the pleadings, the Court recommends that Plaintiff's motion for summary judgment be **DENIED**, and that the *Commissioner's Motion for Summary Judgment* be **GRANTED**.

---

[1]Pursuant to this Court's May 3, 2006 *Order*, Plaintiff's reply was deemed timely.

# I. BACKGROUND[2]

## A. Procedural History

Teresa Wilson ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II of the Social Security Act. On June 13, 2002, Plaintiff filed an application for disability benefits. (Tr. at 56-58.) Plaintiff's application was denied initially and upon reconsideration. (Tr. at 30-31.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 29.) A hearing, at which Plaintiff personally appeared and testified, was held on January 13, 2004. (Tr. at 761-806). On March 19, 2004, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 17-27.) On April 15, 2005, the Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision.[3] (Tr. at 4-7.) Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 4.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on June 14, 2005.

## B. Factual History

### 1. Age, Education, and Work Experience

Plaintiff was born on September 3, 1963. (Tr. at 56.) She was 40 years old at the time of the hearing before the ALJ. (*See id*.; Tr. at 763.) She has two associate's degrees, one in accounting and one in business management. (Tr. at 770.) Her past work experience included work as a data

_____

[2] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

[3] Since the ALJ's March 19, 2004 decision, Plaintiff was found to be under a disability based on an application she filed on August 3, 2004. *See* Tr. at 4. However, the Appeals Council found that this information did not warrant a change in the ALJ's decision regarding Plaintiff's June 13, 2002 application. *Id*.

entry clerk, a cashier, and as a cook and driver for Domino's Pizza. (Tr. at 69, 773-74, 802.) Plaintiff last worked in December 2000. (Tr. at 770.)

### 2. *Medical Evidence*

Plaintiff began to experience radiating pain throughout her body in 1997. (Tr. at 781.) Her pain was manageable for several years, but in December 2000, she reached a point where she had exhausted her available leave and was unable to continue working. (Tr. at 770-71.)

The first medical consultation relevant to the instant claim of disability was not until July 23, 2001. (*See* Tr. at 357.) On this date, Plaintiff saw her family physician, Dr. Gerald George, D.O., at the Methodist Family Health Center in Grand Prairie, Texas. Dr. George noted that Plaintiff experienced acute "muscle pain" and referred her to Dr. William Hwang, M.D., for a neurological consultation. (*See* Tr. at 357, 717.)

Dr. Hwang examined Plaintiff on July 30, 2001, for her complaints of hand, arm, and leg numbness; difficulty sleeping; slurred speech; leg kicking; and migraine headaches. (Tr. at 717.) Dr. Hwang's physical examination noted that Plaintiff's motor function was 5/5 in her bilateral upper and lower extremities, that sensation was decreased in the distal upper and lower extremities, and that she did not have any significant neck pain or back tenderness. (Tr. at 717-18.) Dr. Hwang diagnosed Plaintiff with (1) hand numbness, especially in the left small finger and arm and leg numbness and muscle aches; (2) insomnia; (3) occasional slurred speech; (4) restless leg syndrome; (5) smoking; and (6) migraine headaches. (Tr. at 718.) Dr. Hwang ordered a series of diagnostic tests and told Plaintiff to stop smoking. (Tr. at 718.)

Plaintiff returned for a follow-up visit with Dr. Hwang on August 20, 2001. (Tr. at 708.) Dr. Hwang noted that Plaintiff was still smoking and that sensation in both her feet was decreased.

*Id.*  A nerve conduction study revealed that some of Plaintiff's nerves had a prolonged reaction but that the EMG of her left lower extremity was unremarkable.  *Id.*  Dr. Hwang diagnosed Plaintiff with (1) moderate to severe bilateral carpal tunnel syndrome; (2) sensory motor peripheral neuropathy[4] with demyelinating axonal features; (3) diabetes with hyperglycemia; (4) bilateral Guyon canal[5] syndrome with ulnar nerve entrapment at the wrist; and (5) a low probability of left L2-S1 radiculopathy.  *Id.*  Dr. Hwang prescribed Neurontin and vitamin B6 and referred Plaintiff to a hematologist for her susceptibility to bruising.  *Id.*  Dr. Hwang also planned for Plaintiff to return in two months, (*see id.*), although the available medical records show that she did not return.

On September 22, 2001, Plaintiff was admitted to the emergency room of Arlington Memorial Hospital in Arlington, Texas, on a complaint of chest pain.  (Tr. at 114.)  In addition to her chest pain, Plaintiff complained of pain in both lower extremities and calf area with some soreness.  *Id.*  She told Dr. Gopal Doshi, M.D., her examining physician, that although she started the Neurontin prescribed by Dr. Hwang, she was not presently taking it because she did not tolerate the medication well.  *Id.*  Dr. Doshi's physical examination of Plaintiff's lower extremities were normal apart from mild soreness in both calves.  (Tr. at 116.)  In a physical examination on the referral of Plaintiff's chest pain, two other medical doctors, Dr. Alan Taylor and Dr. Luis Guerra, noted tenderness but no other abnormalities in both of Plaintiff's legs.  (Tr. at 119, 127.)  A fourth doctor, Dr. Sanjay Awasthi, M.D., examined Plaintiff; despite reported numbness and tingling in her

---

[4]Peripheral neuropathy is a common ailment that results from the abnormal functioning of the nerves relaying information between the central nervous system and muscle and organ groups.  It can result in pain, loss of sensation, or inability to control muscles.  MEDICAL ENCYCLOPEDIA, U.S. NATIONAL LIBRARY OF MEDICINE (2006).  *Available at* http://www.nlm.nih.gov/medlineplus/ency/article/000593.htm.

[5]The Guyon canal is a potential space between two bones in the wrist through which the ulnar artery and ulnar nerve travel into the hand.

finger, Dr. Awasthi noted no abnormalities or tenderness in her extremities. (Tr. at 122-23.) Dr. Taylor also expressed concern about Plaintiff's tobacco abuse and noted that he discussed behavior modification with Plaintiff at length. (Tr. at 120.) After consulting with several doctors regarding her chest pain, Plaintiff was diagnosed with a pulmonary embolism and was treated with heparin, an anticoagulant. (Tr. at 111, 116-17.)

On January 14, 2002, Dr. Rizwan Shah, M.D., a neurologist at UT-Southwestern Medical Center in Dallas, Texas, examined Plaintiff after a referral for her complaints of muscle and joint pain. (Tr. at 286-87.) Plaintiff also complained about abnormal tingling sensations (parasthesias) in her hands and feet. (Tr. at 286.) The clinical history taken on this date did not mention Plaintiff's previous neurological assessment by Dr. Hwang. (*See* Tr. at 286.) Dr. Shah's neurological examination noted that Plaintiff's strength was graded as "5/5 all over;" that her deep tendon reflexes were symmetric; that there was a stocking type sensory impairment; and that Plaintiff had a subjective tenderness to deep palpitation and tenderness in the back. (Tr. at 287.) Dr. Shah diagnosed Plaintiff with (1) fibromyalgia[6] and osteoarthritis, (2) peripheral neuropathy, and (3) diabetes mellitus. *Id.* Dr. Shah prescribed trial medications of Amitriptyline and Topamax for her fibromyalgia and chronic pain. *Id.* Plaintiff returned to Dr. Shah five times over the next nine months for follow-up visits (*see* Tr. 271-82, 639-40); the diagnoses at these follow-up visits remained the same, although in a letter requesting dismissal from jury duty, he noted that Plaintiff also suffered from chronic pain. (Tr. at 270.)

---

[6]Fibromyalgia is a chronic syndrome characterized by muscle pain and fatigue. People with fibromyalgia have "tender points" on the body, which are specific places that hurt when pressure is applied. Other symptoms of fibromyalgia include insomnia, morning stiffness, headaches, tingling or numbness in hands and feet, and problems with thinking and memory. WHAT IS FIBROMYALGIA? NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES (March 2005). *Available at* http://www.niams.nih.gov/hi/topics/fibromyalgia/fffibro.htm.

On June 19, 2002, Plaintiff received a neurosurgical consultation from Dr. Frederick Todd, II, M.D., for her complaints of dizzy spells. (Tr. at 294-96.) Dr. Todd's motor examination noted "5/5 strength in all muscle groups in the upper and lower extremities;" he also noted that Plaintiff had hypoactive reflexes in the deep tendons of her upper and lower extremities. (Tr. at 295.) Dr. Todd ruled out a tumor as the source of Plaintiff's dizzy spells and instead suspected that she might have a cardiac arrhythmia. (Tr. at 296.) Dr. Todd stated that an MRI showed a pituitary mass; however, it was his opinion that the mass was not the source of Plaintiff's dizzy spells. (Tr. at 295-96.)

On September 27, 2002, neurologist Dr. John Thompkins, M.D., examined Plaintiff on complaint of a suprasellar pituitary mass. (Tr. at 687-90.) During the examination, Plaintiff stated that she experienced dizzy spells, pain associated with her fibromyalgia, headaches, muscle cramping in her quadriceps, and difficulty manipulating objects. (Tr. at 687.) After a physical and neurological assessment, Dr. Thompkins recorded a grossly intact sensory exam and noted that Plaintiff's motor strength was 4+/5. (Tr. at 688.)

On February 27, 2003, Dr. George referred Plaintiff to Dr. Rosenstock, M.D., a rheumatologist. (Tr. at 308-11.) After conducting a physical examination, Dr. Rosenstock noted that Plaintiff's range of motion was painful and limited but that it did not cause numbness, tingling, parasthesias, dysesthesias, or radicular pain down to the legs or arms. (Tr. at 310.) Dr. Rosenstock preliminarily diagnosed Plaintiff with multiple painful joints, cervical pain, lower back pain, goiter, hypercoagulability, and possible fibromyalgia. *Id*. In addition to two medications (Trazadone and Capsaicin), Dr. Rosenstock prescribed a therapeutic approach to treat Plaintiff's chronic pain. (Tr. at 310-11.) Plaintiff returned to Dr. Rosenstock on April 2, 2003. (Tr. at 701-02.) Dr. Rosenstock

noted that Plaintiff had a good range of motion in her shoulders, elbows, wrists, fingers, hips, knees, ankles, and toes. (Tr. at 701.) He also noted that although Plaintiff had multiple trigger points throughout her body, they were less painful. *Id*. Dr. Rosenstock diagnosed Plaintiff with (1) fibromyalgia and (2) a positive rheumatoid factor of unknown etiology. (Tr. at 702.)

On April 3, 2003, Plaintiff began to receive treatment from Dr. Craig Henry, M.D., of South Arlington Primary Care. (Tr. at 744.) Dr. Henry prescribed Ritalin to treat her fibromyalgia since Plaintiff was not responding well to Amitriptyline. *Id*. On April 29, 2003, Dr. Henry observed that Plaintiff had a full range of motion in all joints with pain but noted that her fibromyalgia was under improved control. (Tr. at 743.) In a general letter dated May 9, 2003, and addressed "To Whom It May Concern," Dr. Henry wrote that Plaintiff was "presently disabled, due to multiple problems including insulin dependent diabetes, chronic fatigue syndrome, fibromyalgia, polyarthritis and peripheral vascular disease. The duration of disability is most likely indefinite." (Tr. at 313.) On June 3, 2003, Dr. Henry noted that Plaintiff had a full range of motion in both legs and that her fibromyalgia was controlled. (Tr. at 732.)

On July 18, 2003, Plaintiff returned to her rheumatologist, Dr. Rosenstock, who noted that Plaintiff had a good range of motion in her shoulders, elbows, and wrists but a loss of motion in her hips and knees. (Tr. at 699.) Shortly thereafter, on July 29, 2003, Plaintiff told Dr. Henry that her fibromyalgia was "under good control with Ritalin." (Tr. at 729.) Dr. Henry referred Plaintiff to a pain management specialist in early September 2003. (Tr. at 724.)

On September 18, 2003, Plaintiff had her first medical consultation with Dr. Rebecca Schmidt, M.D., a rehabilitative medicine specialist. (Tr. at 750-52.) Dr. Schmidt diagnosed Plaintiff with (1) fibromyalgia with chronic pain, (2) osteoarthritis, and (3) rheumatoid arthritis. (Tr. at 751.)

Dr. Schmidt noted that Plaintiff's pain symptoms were not well controlled and that she has been under-treated for pain. Dr. Schmidt prescribed OxyContin and outpatient aquatics therapy. (Tr. at 751-52.) On November 6, 2003, Plaintiff told Dr. Schmidt that she was doing fairly well and benefitting from the aquatics program. (Tr. at 747.) Plaintiff expressed concern with the fast pace of the land-based therapy program, which Dr. Schmidt discontinued until further notice. *Id.* Dr. Schmidt renewed Plaintiff's outpatient aquatics program on December 11, 2003. (Tr. at 745.)

On March 15, 2004, Dr. Henry completed a questionnaire entitled "Medical Source Statement" regarding Plaintiff's ability to perform activities on a sustained basis. (Tr. at 756-58.) Dr. Henry noted that Plaintiff can reach, grasp, and finger with her right and left arms and hands "occasionally," which is defined as "less than one-third of eight hours." (Tr. at 757.) Dr. Henry also noted that Plaintiff could only sit for an hour at a time for a maximum of three hours in an eight-hour workday. (Tr. at 756.) Dr. Henry indicated that the restrictions due to Plaintiff's fibromyalgia and rheumatoid arthritis existed since at least November 30, 2000. (Tr. at 757-58.) Although Dr. Henry signed the form on March 15, 2004, it was not mailed until March 18, 2004. (*See* Tr. at 756.)

Dr. Schmidt also completed a form entitled "medical source statement." (Tr. at 753-55.) Dr. Schmidt indicated that Plaintiff's ability to "deal with the public" and "deal with work stresses" was "poor to none." (Tr. at 753.) Dr. Schmidt also indicated "poor to none" for Plaintiff's ability to "understand, remember, and carry out complex job instructions" and her ability to "behave in an emotionally stable manner." (Tr. at 754.) According to Dr. Schmidt, Plaintiff's chronic pain affected her mood and impeded her ability to do housework. (Tr. at 755.) Finally, Dr. Schmidt noted that Plaintiff's limitations existed since at least November 30, 2000. *Id.* The form was completed on March 18, 2004. *Id.*

### 3. *Hearing Testimony*

A hearing was held before the ALJ on January 13, 2004. (Tr. at 761.) Plaintiff appeared personally and was represented by an attorney-representative. *Id.* Plaintiff testified that she was born on September 3, 1963,[7] and that she had associate's degrees in accounting and business management. (Tr. at 770.)

Plaintiff testified that she last worked for one week as a housekeeper for her future husband and her future brother-in-law in December 2002. (*See* Tr. at 797-98, 801.) Her last sustained period of employment was in December 2000, when she worked as a manager for Domino's Pizza. (Tr. at 770, 774.) Prior to working at Domino's, she worked as a cashier and deli worker at Taylor's Minimart for approximately ten months. (Tr. at 774-75.) She also worked as a customer service representative at Gall's Incorporated, an equipment company for police and fire departments, for approximately three years. (Tr. at 775.) She did seasonal work as a receptionist for H&R Block and data entry for the health care industry at Clintrals Research Company. (Tr. at 775-76.) She also worked in a position that combined secretarial work with grocery store management for two businesses owned by the same person, Wyatt Plumbing and Shroeders Grocery and Deli. (Tr. at 777.) Finally, she processed insurance claims as a data entry clerk for Kentucky Central Life Insurance, worked as a paralegal, and cleaned upholstery. (Tr. at 778-79.)

Plaintiff testified that she began to experience numbness in her arms and wrists while she was working at Gall's. (Tr. at 781.) The work she performed at Domino's exacerbated the pain,

---

[7]The recorded date of September 3, 1953, in the transcript is a typographical error. (Pl. Br. at 3, n. 9).

which Plaintiff described as constant and radiating throughout her body.[8]  (Tr. at 782.)  Plaintiff testified that although she was enrolled in a pain management therapy aquatic program, she only felt better when she was in the water.  (Tr. at 784.)  She occasionally drove herself the three miles from her home to her aquatic therapy appointments.  *Id.*  She stated that although she had been prescribed a number of medications for her pain, she was allergic to most of it, and her doctors told her that there was nothing they could do.  (Tr. at 790-91.)  Plaintiff testified that she quit smoking in 2003.  (Tr. at 799.)

Plaintiff said that she spent approximately half the day in her recliner.  (Tr. at 792.)  She testified that she had difficulty walking and that she had trouble holding onto things.  (Tr. at 792-94.)  She said that her husband did the housework, cooking, and grocery shopping.  (Tr. at 794-95.)  In 2001, she took a family vacation to California by car but returned early because her pain became unbearable.  (Tr. at 796.)

Once Plaintiff completed her testimony, the ALJ examined a vocational expert ("VE").  The VE described Plaintiff's past work for Kentucky Central Life Insurance as that of a data entry clerk, which is defined in the DICTIONARY OF OCCUPATIONAL TITLES ("DOT") as entry number 230.582-054.  (Tr. at 802.)  The VE described the data entry clerk as a sedentary, semi-skilled occupation with a reasoning level of three, mathematics level of two, and language level of three.  *Id.*

After the ALJ examined the VE, Plaintiff's attorney-representative asked the VE to assume a hypothetical individual with Plaintiff's age, education, and background who was moderately limited in her ability to maintain concentration.  (Tr. at 803.)  The VE testified that such a person

---

[8]Plaintiff testified to a host of other ailments, including light-headedness, lethargy, diabetic coma, blood clots, anxiety, depression, panic attacks, abdominal pain, heart problems, and cancer.  *See* Tr. at 784-90.  However, these ailments are not relevant to the issues presented for review and the Court declines to discuss them.

would have difficulty performing her past relevant work as a data entry clerk. The attorney-representative then asked the VE whether a hypothetical person who was preoccupied with pain and discomfort would be able to stay on task as a data entry clerk; the VE testified that such a preoccupation with pain and discomfort would ultimately pose a problem with job retention in past relevant work and other types of work in general, depending on the severity of the preoccupation. (Tr. at 803-04.) The VE also testified that a hypothetical individual who spends half her waking day reclining or lying down would not be able to perform a job requiring a 40-hour work week. (Tr. at 804-05.)

## C. ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on March 19, 2004. (Tr. at 17-27.) The ALJ noted that Plaintiff was last insured for disability insurance benefits under Title II on November 30, 2000. (Tr. at 19, ¶1.) The ALJ found that Plaintiff had not engaged in substantial gainful activity since November 30, 2000. (Tr. at 20, ¶2.) In addition, he found that Plaintiff had the following medically determinable impairments: hypercoagulable state, diabetes mellitus, fibromyalgia, osteoarthritis, benign pituitary mass, peripheral neuropathy, depression, and anxiety. (Tr. at 20, ¶3.) However, the ALJ concluded that Plaintiff's impairments or combination of impairments did not meet or equal an impairment listed in Appendix 1 of the Social Security regulations. (Tr. at 20, ¶3; Tr. at 22.)

The ALJ found that although Plaintiff had medically determinable impairments which could reasonably cause the symptoms alleged, Plaintiff's testimony was neither credible nor reasonably supported by the objective medical evidence. (Tr. at 22, ¶4.) The ALJ noted that although Plaintiff was diagnosed with moderate to severe bilateral carpal tunnel syndrome in July 2001, she did not

have any further complaints of this problem and subsequent physical examinations were negative except for tenderness in the legs. (Tr. at 23.) The ALJ noted that Plaintiff's ability to perform volunteer work, her recent vacation to California, and her failure to stop smoking all contradicted her assertions of disability. (Tr. at 24.)

The ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of sedentary work with the following restrictions: she could perform all position changes only occasionally; she was limited to jobs with a reasoning development level of 1 to 3; and she required no more than superficial contact with the public. (Tr. at 25, ¶5.) The ALJ noted that Dr. Henry's May 2003 opinion that Plaintiff was disabled was not supported by medically acceptable techniques and was inconsistent with other medical evidence available in the record. (Tr. at 25-26.)

The ALJ found that Plaintiff's past relevant work as a data entry clerk did not require the performance of work-related activities precluded by the above limitations. (Tr. at 26, ¶6.) The ALJ noted that the VE testified that a hypothetical person with Plaintiff's RFC would be able to perform Plaintiff's past relevant work as a data entry clerk. (Tr. at 26, ¶7.) The ALJ concluded that because Plaintiff could perform her past relevant work, she was not under a disability as defined in the Social Security Act at any relevant time through the date of his decision. (Tr. at 26, ¶8.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir.

1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## B.  Issues for Review

Plaintiff presents the following issues for review:

(1)    Is the ALJ's finding that Ms. Wilson has the unrestricted ability to use her arms, hands, and fingers supported by substantial evidence, in light of the neurologist's uncontradicted conclusion that she has "moderate to severe" carpal tunnel syndrome, other structural entrapments of hand, and finger nerves, and peripheral neuropathy?

(2)(a)  With respect to the medical opinion of Dr. Hwang (claimant's neurologist), did the ALJ follow the legal standards contained in *Newton v. Apfel* governing how treating-doctor opinions should be assessed?

(2)(b)  With respect to the medical opinion of Dr. Henry (claimant's internist), did the ALJ follow the legal standards contained in *Newton v. Apfel* governing how treating-doctor opinions should be assessed?  Separately, did the Appeals Council err in failing to remand the Decision under the authority of *Higginbotham v. Barnhart* based on Dr. Henry's March 2004 medical source statement?

(2)(c)  Did the Appeals Council err in failing to remand based on Dr. Schmidt's March 2004 medical source statement?

(3)    Under the applicable legal standards set forth in Social Security Ruling 82-59, is Ms. Thompson's inability to completely stop smoking a valid reason to deny disability compensation, as the ALJ found?

(Pl. Br. at 2-3.)  Plaintiff states that her arguments on appeal are limited to those that have a bearing on her ability to use her hands and fingers effectively.  (Pl. Br. at 5.)

## C.  Issue One: Residual Functional Capacity

Plaintiff first contends that the ALJ's determination of Plaintiff's physical RFC is not supported by substantial evidence because it significantly overstates her ability to use her upper arms, hands, and fingers in both hands.  (Pl. Br. at 10.)  Specifically, Plaintiff contends that the ALJ erred when he failed to include Dr. Hwang's diagnosis of carpal tunnel syndrome and Guyon canal

syndrome with ulnar nerve entrapment among Plaintiff's medically determinable impairments. (Pl. Br. at 11-12.)

Social Security regulations provide for the ALJ to assess a claimant's RFC before proceeding from Step Three to Step Four of the sequential analysis that determines whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). When assessing a claimant's physical abilities, the ALJ first assesses the nature and extent of the physical limitations and then determines the RFC. 20 C.F.R. § 404.1545(b). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id*. "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting." *Id*. at *2 (emphasis in the original). The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).

### 1. Medically Determinable Impairments

In the instant case, the ALJ did not list carpal tunnel syndrome or Guyon canal syndrome with ulnar nerve entrapment among Plaintiff's medically determinable impairments even though these two maladies were diagnosed by Dr. Hwang when he examined Plaintiff on August 20, 2001. (*See* Tr. at 20, ¶3; *cf*. Tr. at 708.) The ALJ noted in his opinion that although diagnostic evidence

existed for these two maladies, there had not been any further complaints of these problems. (Tr. at 23.) In her brief, Plaintiff contends that the record is replete with further complaints of her hand, wrist, and finger pain. (Pl. Br. at 12.)

A review of the medical record finds substantial evidence in support of the ALJ's decision not to include carpal tunnel and Guyon canal syndrome among Plaintiff's medically determinable impairments. When Plaintiff visited Arlington Memorial Hospital on September 22, 2001, for her pulmonary embolism, Dr. Awasthi found no abnormalities or tenderness in Plaintiff's extremities after a physical examination even though she reported numbness and tingling in her left finger. (Tr. at 122-23.) Three other doctors (Dr. Doshi, Dr. Taylor, and Dr. Guerra) also conducted physical examinations and noted no abnormalities in Plaintiff's extremities apart from mild soreness in the calves. (Tr. at 116, 119, 127.) While the four doctors that examined Plaintiff at her September 22, 2001 visit to the hospital were focused on detecting a blood clot, their findings of no abnormalities in Plaintiff's extremities are significant.

Examinations by other physicians provide additional substantial evidence that contradicts Dr. Hwang. For example, four months after Plaintiff's last visit to Dr. Hwang, Plaintiff consulted a second neurologist, Dr. Shah, for her muscle and joint pain. Plaintiff saw Dr. Shah six times over the course of nine months. (*See* Tr. at 271-87, 639-40.) Dr. Shah diagnosed Plaintiff with fibromyalgia and osteoarthritis, peripheral neuropathy, and diabetes mellitus; he did not include carpal tunnel or Guyon canal syndrome among his diagnosis. (*See* Tr. at 287.) Similarly, neither Dr. Todd nor Dr. Rosenstock diagnosed Plaintiff with either carpal tunnel or Guyon canal syndrome when they examined her. (Tr. at 295-96, 310, 744, 751.) It is especially notable that neither Plaintiff's current primary physician, Dr. Henry, nor her rehabilitative specialist, Dr. Schmidt,

diagnosed her with these two maladies.  (*See* Tr. at 744, 751.)  In fact, Dr. Hwang is the *only* doctor

of the ten physicians that examined and treated Plaintiff for her alleged physical impairments that

diagnosed her with carpal tunnel and Guyon canal syndrome.  The ALJ noted the absence of

evidence supporting Dr. Hwang's diagnosis in his decision.  (*See* Tr. at 23) (stating that subsequent

physical examinations were negative [for carpal tunnel and Guyon canal syndrome] except for

tenderness in her calves and back).  Dr. Hwang's diagnosis is therefore inconsistent with other

substantial evidence in the record.[9] *Spellman v. Shalala*, 1 F.3d 357, 364-65 (5th Cir. 1993).  Thus,

the ALJ did not err by excluding carpal tunnel syndrome and Guyon canal syndrome from Plaintiff's

list of medically determinable impairments.  *Leggett*, 67 F.3d at 564.

### 2.  *Ability to Use Arms, Hands, and Fingers*

Having determined that the ALJ did not err in excluding carpal tunnel syndrome and Guyon

canal syndrome from the list of Plaintiff's medically determinable impairments, the Court next

considers whether substantial evidence supports the ALJ's determination of Plaintiff's ability to use

her arms, hands, and fingers.  Several of Plaintiff's treating and examining physicians assessed

Plaintiff's motor strength, reflexes, and range of motion.  Both Dr. Shah and Dr. Todd noted a 5/5

strength in all muscle groups, although Dr. Thompkins noted her strength was 4+/5.  (Tr. at 287,

295, 688.)  Dr. Shah found that Plaintiff's deep tendon reflexes were symmetric, and Dr. Todd

determined that Plaintiff had hypoactive reflexes in the deep tendons of her upper and lower

---

[9]Plaintiff urges the Court to reverse the ALJ's determination of Plaintiff's RFC based on the rule stated in *SEC v. Cherney Corp.*, which requires the reviewing court to judge the propriety of an administrative agency action solely by the grounds invoked in the decision.  332 U.S. 194, 196 (1947); Pl. Br. at 7, 14.  Plaintiff contends that the ALJ's basis for not including carpal tunnel syndrome and Guyon canal syndrome among her medically determinable impairments was because there were "no further complaints" in the record.  (Pl. Br. at 14.)  The ALJ's decision was not based on the absence of further complaints, but rather on the absence of medical evidence that corroborated Dr. Hwang's diagnosis.  (Tr. at 23) (noting the negative results of three physical examinations after Plaintiff's subjective complaints about her pain).

extremities. (Tr. at 287, 295.) With regards to range of motion, Dr. Rosenstock found Plaintiff's range of motion to be painful and limited, but he stated that it did not cause numbness, tingling, parasthesias, dysesthesias, or radicular pain down to the legs or arms. (Tr. at 310.) Approximately one month later, on April 2, 2003, Dr. Rosenstock noted that Plaintiff had a good range of motion in all extremities and that Plaintiff's multiple trigger points throughout her body were less painful. (Tr. at 701.) Dr. Henry, Plaintiff's family physician, observed that Plaintiff had a full range of motion in all joints with pain but noted that her fibromyalgia was under improved control. (Tr. at 744.) After treatment with Ritalin, Dr. Henry noted that Plaintiff's fibromyalgia and the associated pain were controlled. (Tr. at 723, 729.)

The medical evidence from Plaintiff's treating and examining physicians show that she had complete motor strength, a full range of motion, and controlled pain at the time the ALJ issued his decision. After an exhaustive review of the medical records, the Court finds no work-related limitations imposed by any of Plaintiff's treating or examining doctors available to the ALJ at the time of his decision.[10] Given the absence of any limitations by treating or examining physicians on Plaintiff's ability to use her hands, arms, and fingers, the Court concludes that substantial evidence supports the ALJ's assessment of Plaintiff's RFC, which supports his determination that Plaintiff can perform her past relevant work as a data entry clerk.[11] *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d

---

[10]As explained in Part II.D.1.b, *infra*, the questionnaire completed by Dr. Henry on March 15, 2004, was not properly before the ALJ when he issued his decision on March 19, 2004.

[11]There is a discrepancy in the ALJ's decision and the hearing transcript. In his decision, the ALJ stated that he asked the VE whether a hypothetical person with Plaintiff's RFC would be able to perform Plaintiff's past relevant work as a data entry clerk. (Tr. at 26.) The ALJ next stated that the VE testified in the affirmative. *Id*. However, the record from the administrative hearing does not support these statements; the ALJ only asked the VE to describe Plaintiff's past work for Kentucky Central Life Insurance in accordance with the DOT before permitting Plaintiff's attorney to question the VE. (*See* Tr. at 801-05.)

Expert testimony from a VE regarding a claimant's ability to perform past relevant work is optional, not required. *See* 20 C.F.R. § 404.1560(b)(2) (stating that the Commissioner "*may* use the services of vocational experts

at 1386-87.  Plaintiff therefore has not met her burden at Step Four to show that she is disabled.

## D.  Issue Two: Opinions of Treating Physicians

Plaintiff next argues that the ALJ and the Appeals Council failed to follow the proper legal standards when evaluating the opinions of her treating physicians.  (Pl. Br. at 14-21.)

### 1.  ALJ's Assessment of Treating Physicians

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with…other substantial evidence.'"  *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)).  "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, 'the ALJ has sole responsibility for determining a claimant's disability status.'"  *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  If good cause exists, an ALJ may give a treating physician's opinion little or no weight.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id*. at 456.

---

or vocational specialists...to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity") (emphasis added).  Although the reasoning in the ALJ's decision does not reflect what transpired at the hearing, the Court determines that the ALJ did not commit any error in his Step Four analysis when he did not consult with the VE to determine whether Plaintiff was capable of performing her past relevant work.  Moreover, Plaintiff abandoned this issue on appeal because she did not raise it as an issue presented to the Court for review as required by this Court's October 6, 2005 scheduling order.  (*See* Pl. Br.)

The Fifth Circuit held in *Newton* that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. Thus, before deciding not to give any weight to a treating physician's opinion, an ALJ must consider: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *Id.* at 456 (citing 20 C.F.R. § 404.1527(d)(2)). However, the court expressly excluded from the scope of *Newton* those cases "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" as well as cases in which "the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458. Thus, "*Newton* is limited to circumstances where the administrative law judge summarily rejects the opinions of a claimant's treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." *Contreras v. Massanari*, 2001 WL 520815, at *4 (N.D. Tex. May 14, 2001); *see also Newton*, 209 F.3d at 458; *Pedraza v. Barnhart*, 2003 WL 22231292, at *5 (W.D. Tex. Sept. 15, 2003).

### a. Dr. Hwang

Plaintiff contends that the ALJ did not properly assess Dr. Hwang's diagnosis that Plaintiff suffered from carpal tunnel and Guyon canal syndrome. (Pl. Br. at 2, 16-17.) In support of this

assertion, Plaintiff argues that Dr. Hwang's diagnosis is entitled to controlling weight because no other doctor performed a nerve conduction study and no other neurologist contradicted his assessment. (Pl. Br. at 16; Pl. Reply at 3.) With regards to Dr. Hwang's decision to perform a nerve conduction study, it is true that he was the only one to do so. However, Plaintiff only visited Dr. Hwang on two occasions and last saw him on August 20, 2001; she did not receive any further care from Dr. Hwang despite his explicit notation that she "[r]eturn in 2 months." (Tr. at 708.) Instead of returning to the doctor that diagnosed her with carpal tunnel and Guyon canal syndrome, Plaintiff sought treatment for her complaints from other physicians. Not one determined the need to perform a nerve conduction study, and not one diagnosed her with carpal tunnel or Guyon canal syndrome.

Plaintiff's assertion that no other neurologist contradicted Dr. Hwang's diagnosis is not supported by the evidence. Plaintiff misstates the medical record when she claims that "the only other neurological evidence in the record is from a Dr. Thompkins, who evaluated the neurological effects" of the pituitary mass. (Pl. Reply at 3, n.3.) Dr. Thompkins considered more than Plaintiff's chief complaint of a suprasellar pituitary mass; he also considered Plaintiff's pain, cramping, and dizzy spells in his diagnosis; none of these complaints led him to suspect carpal tunnel or Guyon canal syndrome. (*See* Tr. at 687.) Plaintiff also declines to address her treatment by Dr. Shah, a clinical assistant professor of neurology at UT-Southwestern. Dr. Shah examined Plaintiff six times over the course of nine months, which was more often and for a longer period of time than the care she received under Dr. Hwang. (*See* Tr. at 271-87, 639-40.) Despite examining Plaintiff for her specific complaints of pain, tingling, and fatigue (the same complaints presented to Dr. Hwang), Dr. Shah never saw the need for a nerve conduction study, nor did he diagnose her with carpal tunnel or Guyon canal syndrome. (*See id.*) Thus, by not diagnosing Plaintiff with carpal tunnel or Guyon

canal syndrome, two treating and examining neurologists implicitly rejected Dr. Hwang's diagnosis.[12]

Although Plaintiff only visited Dr. Hwang twice, the number of visits is not the controlling factor in the ALJ's decision not to accord his diagnosis controlling weight. *See* 20 C.F.R. § 404.1502 (ongoing treatment relationship with an acceptable medical source established by medical evidence that the source has been seen with a frequency consistent with accepted medical practice for the type of treatment.) Rather, assuming Dr. Hwang was a treating physician, the ALJ's decision not to accord controlling weight to his determination that Plaintiff suffered from carpal tunnel and Guyon canal syndrome is consistent with the diagnoses of two other neurologists as well as seven other treating and examining physicians. Plaintiff's medical record presented the ALJ with competing first-hand medical evidence, and the ALJ found as a factual matter that carpal tunnel syndrome and Guyon canal syndrome were not among Plaintiff's ailments. *Martinez*, 64 F.3d at 174 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (noting that "conflicts in the evidence, including medical opinions, are to be resolved by the Secretary, not by the courts")). The situation of competing first-hand medical evidence is explicitly excluded from the scope of *Newton*; the ALJ therefore was not required to perform the six-factor analysis before declining to give Dr. Hwang's diagnosis controlling weight. 209 F.3d at 458. For the same reasons, because the extensive medical record enabled the ALJ to determine that Plaintiff did not suffer from either carpal tunnel syndrome or Guyon canal syndrome, he was not required to recontact Dr. Hwang for additional information. *Id*. at 458; 20 C.F.R. § 404.1512(e). The ALJ therefore did not err in weighing the opinion of Dr.

---

[12]Not only did Dr. Thompkins and Dr. Shah reject Dr. Hwang's diagnosis of carpal tunnel and Guyon canal syndrome, but *all* of Plaintiff's other treating and examining physicians rejected his diagnosis as well. (*See* Part II.C.1, *supra*.) Dr. Hwang's diagnosis is therefore inconsistent with the weight of the medical evidence.

Hwang.

### b. Dr. Henry

Plaintiff also asserts that the ALJ erred in weighing Dr. Henry's medical opinion because he did not employ the six-factor analysis or recontact Dr. Henry as required under *Newton*.  (Pl. Br. at 18.)  Specifically, Plaintiff objects to the ALJ's determination that Dr. Henry's May 9, 2003 opinion was not entitled to controlling weight.  (Pl. Br. at 17.)

The ALJ rejected Dr. Henry's May 9, 2003 opinion finding Plaintiff "presently disabled" because he found it to be unsupported by medically acceptable diagnostic techniques and inconsistent with other substantial evidence in the record.  (Tr. at 26, 313.)  The Court first notes that opinions as to a claimant's disability by a treating physician are never entitled to controlling weight because determinations of disability are legal issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e); *Frank v. Barnhart*, 326 F.3d 618, 629 (5th Cir. 2003).  However, the ALJ did not reject Dr. Henry's opinion of Plaintiff's disability because it expressed an opinion as to a legal issue; rather, the ALJ rejected the opinion because it was unsupported by and inconsistent with the medical record.  (*See* Tr. at 26.)  Since "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision," the Court must determine whether Dr. Henry's May 9, 2003 opinion is unsupported by or inconsistent with the evidence in the medical record available to the ALJ at the time of his decision.  *Newton*, 209 F.3d at 455; *see Cherney*, 332 U.S. at 196.

Dr. Henry stated that the "multiple problems" responsible for Plaintiff's disability included "insulin dependent diabetes, chronic fatigue syndrome, fibromyalgia, polyarthritis, and peripheral vascular disease."  (Tr. at 313.)  Dr. Henry's inclusion of chronic fatigue syndrome and peripheral vascular disease as contributing factors to Plaintiff's alleged disability are inconsistent with the

medical evidence. Dr. Henry did not diagnose Plaintiff with peripheral vascular disease until June 6, 2003, almost a month after the letter was written. (Tr. at 732.) The first and only diagnosis of chronic fatigue syndrome appears on May 9, 2003, where Dr. Henry also posits that Plaintiff's medications might instead be responsible for her ongoing fatigue (Tr. at 732); chronic fatigue syndrome does not appear as a possible diagnosis in any of Dr. Henry's subsequent diagnoses. (*See* Tr. at 724, 729, 732.) Moreover, no other treating or examining physician diagnosed Plaintiff with either peripheral vascular disease or chronic fatigue syndrome. As for the three other problems identified in the May 9, 2003 letter (diabetes, fibromyalgia, and polyarthritis), neither Dr. Henry nor any other treating or examining physician imposed any work-related limitations that support Dr. Henry's opinion that these conditions are disabling. The ALJ considered the medical evidence available to him at the time of the decision and found, based on Plaintiff's medically determinable impairments and RFC, that she was capable of performing her past relevant work as a data entry clerk. Dr. Henry's May 9, 2003 opinion that Plaintiff was disabled was inconsistent with substantial evidence showing that she was not disabled. *Martinez*, 64 F.3d at 172. Since reliable medical evidence from other treating and examining physicians controverts Dr. Henry's claim that Plaintiff is disabled, *Newton* does not apply. 209 F.3d at 453.

Plaintiff also contends that under *Newton*, the ALJ had a duty to recontact Dr. Henry to clarify whether Plaintiff's ailments were disabling. (Pl. Br. at 18.) As stated previously, *Newton* does not apply because the ALJ rejected the May 9, 2003 opinion on the basis that competing first-hand evidence showed Dr. Henry's opinion of Plaintiff's disability was unsupported by substantial evidence in the record. *See Newton*, 209 F.3d at 458. Moreover, the duty to recontact a treating physician only applies when evidence from the available medical record is inadequate to determine whether a claimant is disabled. 20 C.F.R. § 404.1512(e). The absence of work-related restrictions

in Plaintiff's medical record was more than adequate to enable the ALJ to find that Plaintiff was capable of performing her past work and therefore not disabled. Thus, not only does the six-factor analysis not apply, but the duty to recontact a treating physician does not apply, either.

Finally, Plaintiff contends that she can show prejudice in the ALJ's failure to recontact Dr. Henry with the "medical source statement" dated March 15, 2004. (Pl. Br. at 18-20.) Dr. Henry's statement found that Plaintiff can reach, grasp, and finger with her right and left arms and hands only "occasionally," which is defined as "less than one-third of eight hours." (Tr. at 756-58.) Plaintiff contends that because the DOT description of a data entry clerk requires a person to reach, grasp, and finger more than "occasionally," the position of a data entry clerk is incompatible with Plaintiff's capabilities. (Pl. Br. at 19-20; *see* DEPT. OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, § 230.582-054 (4th ed. 1991)). However, Dr. Henry's statement was mailed to the ALJ on March 18, 2004, one day prior to his decision denying Plaintiff's application for disability benefits. (*See* Tr. at 756; *cf.* Tr. at 27.) Plaintiff submitted no proof that the ALJ received the statement prior to issuing his decision. Moreover, Social Security regulations ordinarily provide that evidence be submitted no later than five business days before the date of the administrative hearing. 20 C.F.R. § 405.331. Nevertheless, at the hearing the ALJ gave Plaintiff until February 13, 2004, to submit additional medical records. (Tr. at 768, 805.) Even with this extension, the new evidence was untimely. Since Dr. Henry's statement was not mailed until one day before he issued his decision and more than a month after the ALJ's extension for the submission of evidence, the statement was not properly before the ALJ at the time of his decision.[13] In essence, Plaintiff requests the Court to

---

[13]Notably, Plaintiff did not request the ALJ to reconsider his decision in light of Dr. Henry's questionnaire. *See* 20 C.F.R. § 405.373 (providing procedures for the submission of new evidence no later than 30 days after receipt of the decision). Rather, Plaintiff requested review directly from the Appeals Council ten days after the issuance of the ALJ's decision. (Tr. at 16.)

find prejudice and reversible error based upon a single document mailed to the ALJ one day before his decision was issued that, in light of the other available medical evidence, was unnecessary to the determination of Plaintiff's disability and that the ALJ had no duty to seek. The Court declines to do so.[14]

### 2. *Appeals Council's Consideration of New Evidence from Treating Physicians*

Plaintiff contends that the Appeals Council's failure to consider the March 2004 "medical source statements" from Dr. Henry and Dr. Schmidt presents an independent basis for reversal under *Higginbotham v. Barnhart*, 405 F.3d 332 (5th Cir. 2005). (Pl. Br. at 20-21.) According to Plaintiff, *Higginbotham* holds that (1) new and material evidence submitted for the first time to the Appeals Council is part of the entire record for purposes of review in federal court and (2) it is error for the Appeals Council to fail to reverse an ALJ's decision when new evidence is submitted that undercuts the decision. (Pl. Br. at 20.)

In *Higginbotham*, the claimant submitted a medical source statement from his treating physician to the Appeals Council after the ALJ denied his request for benefits. 405 F.3d at 334. The medical source statement concluded that the claimant suffered from a complete loss of ability to perform regular employment activity because he lacked the mental abilities for unskilled work. *Id*. The Appeals Council denied Higginbotham's request for review and noted that although it considered the medical source statement, the additional evidence did not provide a basis for reversing the ALJ's decision. *Id*. On appeal to the Northern District of Texas, the district judge specifically declined to consider the new evidence submitted to the Appeals Council. *Id*. On appeal

---

[14]To the extent that Plaintiff argues that prejudice resulted from the ALJ's failure to consider Dr. Schmidt's "medical source statement" signed and mailed on March 18, 2004 (Pl. Br. at 20-21; Tr. at 753-55), the Court disagrees. No prejudice resulted from the ALJ's inability to consider a document he did not possess, did not need, and did not have a duty to request.

to the Fifth Circuit, the precise issue considered was whether the district court should have reviewed and considered the evidence Higginbotham submitted to the Appeals Council but failed to present to the ALJ. *Id*. at 335. The Fifth Circuit concluded that the record before the Appeals Council, which included the claimant's newly submitted medical source statement, constituted part of the record upon which the Commissioner's final decision (including the Appeals Council's denial of a request for review) was based. *Id*. at 337. Finding that the district court should have considered and addressed the evidence Higginbotham submitted to the Appeals Council, the Fifth Circuit vacated and remanded the case for further consideration.[15] *Id*. at 338. *Higginbotham* did not hold, as Plaintiff contends in relevant part, that the Appeals Council erred when it failed to reverse the ALJ's decision on the basis of claimant's newly submitted evidence that did not support the ALJ's determination of disability. (Pl. Br. at 20.)

The factual situation of *Higginbotham* is remarkably similar to the instant case, with the exception that instead of submitting Dr. Henry and Dr. Schmidt's March 2004 "medical source statements" directly to the Appeals Council, Plaintiff first submitted them to the ALJ, albeit not in time for consideration in his March 19, 2004 decision. This distinction in light of *Higginbotham* is immaterial since Plaintiff briefed the Appeals Council on Dr. Henry and Dr. Schmidt's March 2004 statements, and because the Appeals Council considered the additional evidence. (*See* Tr. at 5, 10-12.)

The Appeals Council was required to review Plaintiff's case if the new evidence was material and not contrary to the weight of the evidence on record. 20 C.F.R. § 404.970(b). The

---

[15]On reconsideration, the district court found that the Commissioner's decision denying Higginbotham benefits was supported by substantial evidence in the record as a whole, including the new evidence from his treating physician. *See Higginbotham v. Barnhart*, 163 Fed.Appx. 279, 2006 WL 166284 (5th Cir. 2006). On appeal, the Fifth Circuit affirmed the district court's reconsideration. *Id*. at *3.

Court first considers whether the limitations imposed by Dr. Henry and Dr. Schmidt in their March 2004 statements were contrary to the weight of the evidence.  Dr. Henry imposed restrictions on Plaintiff's ability to reach, grasp, finger, and sit, but none of his examination notes from April through November 2003 impose any manipulative or sitting restriction on Plaintiff's activities.  (*See* Tr. at 719-44.)  Dr. Henry noted that Plaintiff had a good range of motion and that her fibromyalgia was "under good control with Ritalin."  (Tr. at 729, 732.)  Similarly, Dr. Schmidt's assessment of Plaintiff's mental impairments is not supported by her examinations of Plaintiff.  In the March 18, 2004 statement, Dr. Schmidt noted that Plaintiff's ability to "deal with the public" and "deal with work stresses" was "poor to none;" Dr. Schmidt also indicated "poor to none" for Plaintiff's ability to "understand, remember, and carry out complex job instructions" and her ability to "behave in an emotionally stable manner."  (Tr. at 753-54.)  However, none of these mental limitations are noted in Dr. Schmidt's examinations of Plaintiff; the examinations instead address Plaintiff's physical condition and the positive effect of the aquatics therapy program in which she was enrolled.  (*See* Tr. at 745-52.)  Both Dr. Henry and Dr. Schmidt responded "yes" to a question asking if Plaintiff's condition and limitation persisted at least since November 30, 2000, her alleged onset date.  (Tr. at 755, 757.)  These responses are not supported by the medical record since the first medical consultation relevant to the instant claim of disability was not until July 23, 2001.  (*See* Tr. at 357).

Since the opinions expressed in both Dr. Henry and Dr. Schmidt's March 2004 statements are inconsistent with their own treatment notes and other available medical evidence, the Court finds that the statements are contrary to the weight of the evidence in the record.  *Greenspan*, 38 F.3d at 236.  The Appeals Council therefore committed no error when it declined to review Plaintiff's case; even in light of the new evidence presented in Dr. Henry and Dr. Schmidt's March 2004 statements, the ALJ's decision was not contrary to the weight of evidence.  20 C.F.R. § 404.970(b).  Because

the March 2004 statements by Dr. Henry and Dr. Schmidt were contrary to the weight of the evidence, they also are not material to the ALJ's determination of Plaintiff's RFC. Additionally, the statements are not material because the ALJ had already addressed the physical and mental limitations of Plaintiff's RFC. For example, the ALJ noted that due to Plaintiff's "continued pain complaints, she is unable to stand for long, lift heavy weights, or perform frequent positional changes." (Tr. at 25.) The ALJ also noted that while Plaintiff's alleged mental impairments may limit her ability to work, they were not shown to be disabling. *Id.* The RFC accounted for these considerations because it imposed the additional restrictions of performing all positional changes only occasionally, limited Plaintiff to jobs with a reasoning development level of 1 to 3, and required Plaintiff to engage in no more than superficial contact with the public. (Tr. at 25, ¶5.) Because the RFC already accounted for Plaintiff's physical and mental limitations, additional evidence inconsistent with the bulk of the medical evidence was not material to the ALJ's decision, and the Appeals Council did not commit error when it declined to review Plaintiff's case. 20 C.F.R. § 404.970(b).

## E. Issue Three: Plaintiff's Inability to Stop Smoking

The final issue Plaintiff presents is her assertion that the ALJ erred when he based his decision, in part, on Plaintiff's inability to stop smoking. (Pl. Br. att 21.) Specifically, Plaintiff contends that the ALJ did not follow SSR 82-59, the regulation that describes the procedures an ALJ must follow before denying disability based on a claimant's failure to follow prescribed treatment. (Pl. Br. at 22-23); *See* SSR 82-59, WL 31382 (S.S.A. Nov. 30, 1981).

Social Security Regulation 82-59 is inapplicable to the instant case. The ALJ determined that Plaintiff was not disabled because she retained the RFC to perform her past relevant work, not

because she failed to follow prescribed treatment.[16]  (Tr. at 26, ¶¶7,8.)  Plaintiff's inability to stop

smoking appears only once in the ALJ's decision.  As part of a lengthy discussion assessing the

medical evidence in support of Plaintiff's alleged symptoms and her credibility, the ALJ included

the following paragraph, which is quoted in its entirety:

> [o]ther evidence contradicts her assertions of disability.  For example, Ms. Wilson
> reported that her symptoms from her pulmonary embolism started when she was
> doing volunteer work at the airport.  She had also just completed a round-trip
> automobile trip from Texas to California and back.  The ability to perform these
> activities contradict her assertions of disability.  In addition, Ms. Wilson has
> continued to smoke, despite warnings to stop.  This indicates that she does not take
> her impairments seriously.

(Tr. at 24) (citations omitted.)  The single sentence in the above paragraph is the only reference to

smoking in the ALJ's entire decision, and when viewed in context, it is clear that Plaintiff's inability

to stop smoking is but an illustrative example of evidence that contradicts her assertion of disability.

It was not, as Plaintiff contends, a basis for the denial of disability.[17]

### III.   RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the

Commissioner be **AFFIRMED**.

---

[16]The Court notes that at least two of Plaintiff's treating and examining physicians specifically told her to stop smoking as part of her treatment plan.  *See* Tr. at 120 (Dr. Taylor "had a long talk about cardiac risk factor modification" and Plaintiff's tobacco abuse); *see* Tr. at 718 (Dr. Hwang's notation that "[p]atient was told to stop smoking.")  However, the Court declines to address whether warnings about the health risks of smoking constitute prescribed treatment because the ALJ found Plaintiff "not disabled" based on her ability to perform past relevant work.

[17]Defendant argues in the alternative that the ALJ properly considered smoking in his assessment of Plaintiff's credibility.  (Def. Br. at 13-14.)  The Court notes that even if the ALJ improperly considered smoking in his credibility assessment, the ALJ identified several other examples in his decision that caused him to doubt Plaintiff's credibility, such as her car trip to California and her unsubstantiated history of stroke, cancer, and mental impairments.  (*See* Tr. at 24-25.)  However, since the ALJ's denial of disability was not based on Plaintiff's inability to stop smoking, the Court declines to consider Defendant's alternative pleading and Plaintiff's reply on the issue of smoking and credibility.

**SO RECOMMENDED**, on this 10th day of August, 2007.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE